IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **HEMA PENTAKOTA,** | § § § | |
| *Plaintiff*, | § § | **Civil Action No.** |
| v. | § § | **ECF** |
| | § | |
| **NOKIA USA, INC.** | § § § | |
| *Defendant*. | § § | |

### PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

NOW COMES Plaintiff Hema Pentakota and files this, her Original Complaint and Jury Demand, and respectfully shows the following:

## I.
## PARTIES

1. Hema Pentakota is an individual who now resides in London, England.

2. Nokia USA, Inc., ("Nokia") is a Delaware Corporation with a principal place of business at 6000 Connection Drive, Irving, Texas 75039. Nokia USA, Inc. can be served by serving its registered agent, Corporation Service Company d/b/a CSC Lawyers Inco at the following address: 211 E. 7th Street, Suite 620, Austin, Texas 78701.

## II.
## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction to hear this complaint under 28 U.S.C. § 1331 because this case asserts claims for violations of 42 U.S.C. § 12101 *et seq*.

2. Personal jurisdiction over Defendant is appropriate because Defendant operates its business in the State of Texas. Specifically, Defendant has a location at 3100 Olympus Blvd, Coppell, Texas 75019. Further, an exercise of jurisdiction will not offend traditional notions of fair play and substantial justice.

3. Venue is proper in this district under 42 U.S.C. §2000e-5(f)(3) because the alleged unlawful employment practices were committed in Dallas County, Texas.

### III. FACTS

4. Hema Pentakota first began working for Nokia in 2005.

5. For the duration of her employment, Ms. Pentakota always gave her best efforts to Nokia.

6. Indeed, Ms. Pentakota was a stellar employee, having no disciplinary history whatsoever.

7. Ms. Pentakota had every intention of working for Nokia until the time of her retirement.

8. Following the death of her father on March 8, 2018, Ms. Pentakota experienced extreme depression, but Ms. Pentakota continued to give Nokia her best efforts.

9. Up to this point, Nokia had no issues with Ms. Pentakota's performance.

10. The situation began to go awry when Mr. Pentakota had to transition to Christopher Stark's team.

11. Unbeknownst to Ms. Pentakota at the time of her transition, Mr. Stark harbored biases and prejudices against individuals with disabilities.

12. Indeed, Mr. Stark repeatedly verbally abused and harassed Ms. Pentakota.

13. Ms. Pentakota informed Mr. Stark that she was in depression and his verbal abuse was affecting her state of mind.

14. It was at this time that Ms. Pentakota made the request of a reasonable accommodation by requesting Mr. Stark to minimize his abusive attitude.

15. Mr. Stark ignored Ms. Pentakota's request concerning her disability and continued with his inappropriate behavior.

16. Ms. Pentakota did what any employee should do. She filed a complaint against Mr. Stark on October 30, 2018 with HR Representative Marlo Oglesby.

17. Ms. Oglesby instructed Ms. Pentakota to seek assistance from Nokia's Employee Assistance Program. Later, HR mentioned it would schedule a conference call with both Mr. Stark and Ms. Pentakota.

18. Instead of arranging the conference call to discuss Ms. Pentakota's complaint, Mr. Stark and HR discussed Ms. Pentakota's disability but did not speak with Ms. Pentakota.

19. In November 2018, Christy Gliori, a Disability HR representative, contacted Ms. Pentakota regarding her disability and agreed to assist Ms. Pentakota with her depression after the New Year.

20. On or about December 6, 2018, due to her disability relapsing, Ms. Pentakota requested help to manage her heavy workload.

21. In an email to Dirk Vermeulen, Jason Allen, and Mr. Stark, Ms. Pentakota informed these individuals of her health concerns associated with her disability and the need for support.

22. Instead of offering Ms. Pentakota the support she needed and knowing that Ms. Pentakota had expressed concerns about her disability, Mr. Stark continued to verbally abuse Ms. Pentakota. Particularly, during a phone call between Ms. Pentakota and Mr. Stark in December 2018, Mr. Stark verbally abused Ms. Pentakota, then he abruptly ended the phone call.

23. About a week later, Mr. Stark commented that she was "the lynchpin of this project," which shows that Ms. Pentakota was, in fact, giving her best efforts and was performing the essential functions of job.

24. Indeed, in January 2019, Ms. Pentakota was recognized for her excellent performance.

25. Shortly after being praised for her performance, Mr. Stark and Ms. Gliori instructed Ms. Pentakota to complete a Fitness for Duty Evaluation ("FFDE").

26. Ms. Gliori nor Mr. Stark had a legitimate reason to require Ms. Pentakota to complete the exam. The reason for the requiring Ms. Pentakota to complete the FFDE was Mr. Stark's direct attempt to end Ms. Pentakota's career as he had promised. This did not surprise Ms. Pentakota because Mr. Stark had previously commented that he had done horrible things to people in the past.

27. Shortly thereafter, on or about January 25, 2019, Ms. Pentakota was denied work access and was unable to work for many months.

28. Ms. Gliori then instructed Ms. Pentakota not to contact Nokia or anyone associated with the company.

29. Being away from her job and not having the ability to work exacerbated Ms. Pentakota's disability.

30. On February 15, 2019, Ms. Pentakota completed the Fitness for Duty Evaluation; however, Nokia refused to allow her to return to work.

31. It became evident that Mr. Stark wanted Ms. Pentakota isolated from his team and thought he could force Ms. Pentakota to resign her position.

32. However, Ms. Pentakota remained loyal to Nokia by going through all the appropriate channels to address her concerns.

33. On or about March 18, 2019, Ms. Pentakota attempted to address her concerns and complaint with CEO Rajee Suri on multiple occasions.

34. On or about March 21, 2019, a senior investigator, Sonia Zeledon, was assigned to Ms. Pentakota's case.

35. Ms. Pentakota was surprised to learn that Ms. Zeledon was assigned to her case because Ms. Zeledon generally handles finance related issues, not discrimination and retaliation issues.

36. On or about April 4, 2019, Ms. Zeledon closed Ms. Pentakota's investigation without addressing any of Ms. Pentakota's concerns.

37. The next day, on or about April 5, 2019, Nokia notified Ms. Pentakota that it would terminate her contract because she made complaints to the CEO and her position was no longer needed.

38. However, the projects that Ms. Pentakota worked on were, in fact, continuing.

39. Lisa Francica instructed Ms. Pentakota to plan her return back to India by May 5, 2019.

40. Ms. Francica pressured Ms. Pentakota to purchase a flight for her return to India and to share the flights details with her by April 12, 2019.

41. To comply HR demands and against her wishes, Ms. Pentakota submitted her expenses, which included her flight to India.

42. Ms. Pentakota became worried about her work status and experienced a severe episode of depression.

43. She aggressively started looking for another job with Nokia, so she could continue to carry out the company's goals and mission.

44. Ms. Pentakota, ultimately, found employment as a Technical Product Manager on May 25, 2019.

45. Ms. Pentakota began her employment with Nokia again on August 5, 2019.

46. However, she was terminated nearly a month later, on or about September 13, 2019.

47. The stated reason for the termination is seeking reimbursement for a ticket purchase to India and hotel expenses following her termination in April.

48. But this does not stand to reason because Ms. Francica instructed Ms. Pentakota to purchase her flight ticket.

49. Ms. Pentakota has always been upfront and honest about the ticket purchase.

50. There was nothing untoward or self-dealing concerning Ms. Pentakota's purchase of the return ticket to India.

51. The real reason for Ms. Pentakota's termination is her disability and her complaint of discrimination.

52. Ms. Pentakota filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission and has received his Notice of Right to Sue. Ms. Pentakota files this suit within the requisite 90 days of receiving said Notice of Right to Sue.

53. All conditions precedent to the bringing of this suit have been satisfied or have been fulfilled.

## IV.
## DISABILITY DISCRIMINATON

54. Plaintiff incorporates the preceding paragraphs as if fully stated herein.

55. Nokia violated the Americans with Disabilities Act As Amended when it discriminated against Ms. Pentakota because of her disability.

56. Nokia is engaged in an industry affecting commerce and has 15 or more employees during the relevant time period.

57. Plaintiff suffered and suffers from disabilities that limit one or more major life activities.

58. Ms. Pentakota was qualified for her position.

59. Nokia's actions, including but not limited to its termination of Plaintiff undertaken because of Ms. Pentakota's disabilities in violation of 42 U.S.C. § 12101 *et seq*.

60. Nokia's actions were intentional and done with malice or reckless disregard.

61. Because of the actions of Nokia, Ms. Pentakota suffered damages within the jurisdictional limits of this court.

## V.
## DISABILITY RETALIATION

62. Plaintiff incorporates the preceding paragraphs as if fully stated herein.

63. As described above, Nokia's actions constitute unlawful retaliation on the basis of Ms. Pentakota protected activity in violation of the ADAAA and the TCHRA. The employment practices complained of above were intentional.

64. Ms. Pentakota engaged in activities protected under federal and state law, including filing complaints to HR.

65. Nokia subjected Ms. Pentakota to adverse employment action by terminating her employment.

66. Nokia subjected Ms. Pentakota to these adverse employment actions because of her engagement in protected activity.

67. Because of the actions of Nokia, Ms. Pentakota has suffered damages within the jurisdictional limits of this Court.

## VI.
## JURY DEMAND

68. Plaintiff hereby makes a demand for a trial by jury on all issues, claims and defenses in this action.

## VII.
## ATTORNEY FEES & COSTS

69. Plaintiff is entitled to an award of attorney fees and costs under 42 U.S.C. § 12205.

## VIII.
## PRAYER

70. For these reasons, Plaintiff respectfully requests that the above-named Defendant be cited to appear in this matter and that, after jury trial by proof, he be awarded:

    i. Back pay, including but not limited to, lost wages (salary and commissions) and other employment benefits;

    ii. **Reinstatement to Plaintiff's position of employment**, equivalent position of employment, or the position of employment Plaintiff would have enjoyed but for the discrimination and retaliation;

iii. In the event that reinstatement is not feasible, front pay with respect to all pay and benefits Plaintiff would have received but for the termination;

iv. Judgment against Defendant for compensatory damages including emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life;

v. Actual damages;

vi. Punitive damages;

vii. Judgment against Defendant for Plaintiff's reasonable attorneys' and experts' fees; and costs of suit; and

viii. Prejudgment and post-judgment interest as allowed by law;

ix. Such other and further legal and/or equitable relief to which Plaintiff may be justly entitled.

Respectfully submitted,

By: */s/ Deontae D. Wherry*
Deontae D. Wherry
Texas Bar No. 24106566
dwherry@robwiley.com
Robert J. Wiley
Texas Bar No. 24013750
*Board Certified Specialist, Texas Board of Legal Specialization, Labor and Employment Law*

        LAW OFFICE OF ROB WILEY, P.C.
        2613 Thomas Ave.
        Dallas, TX 75204
        Phone: (214) 528-6500
        Fax: (214) 528-6511

        **ATTORNEYS FOR PLAINTIFF**